

ORIGINAL

1  Mark D. Rosenbaum (SBN 59940)
   (mrosenbaum@publiccounsel.org)
2  Kathryn A. Eidmann (SBN 268053)
   (keidmann@publiccounsel.org)
3  Laura Faer (SBN 233846)
   (lfaer@publiccounsel.org)
4  Anne Hudson-Price (SBN 295930)
   (aprice@publiccounsel.org)
5  PUBLIC COUNSEL LAW CENTER
   610 S. Ardmore Avenue
6  Los Angeles, CA 90005
   Telephone: (213) 385-2977
7  Facsimile: (213) 385-9089

8  Morgan Chu (SBN 70446)
   (mchu@irell.com)
9  Michael H. Strub, Jr. (SBN 153828)
   (mstrub@irell.com)
10 IRELL & MANELLA LLP
   1800 Avenue of the Stars, Suite 900
11 Los Angeles, California 90067
   Telephone: (310) 277-1010
12 Facsimile: (310) 282-5600

13 *Attorneys for Plaintiffs and the Proposed Class*

14

15              **IN THE UNITED STATES DISTRICT COURT**

16          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17 PETER P., a minor, by Carolina       )  Case No. LA CV15 3726
   Melendrez, guardian ad litem;        )           MWF (PLAx)
18 KIMBERLY CERVANTES; PHILLIP          )
   W., a minor, by Beatrice W., guardian)  **CLASS ACTION**
19 ad litem; VIRGIL W., a minor, by     )
   Beatrice W., guardian ad litem; DONTE)  **COMPLAINT FOR:**
20 J., a minor, by Lavinia J., guardian ad)
   litem; on behalf of themselves and all)  **1) VIOLATION OF SECTION 504**
21 others similarly situated; RODNEY    )  **OF THE REHABILITATION ACT,**
   CURRY; ARMANDO CASTRO II; and        )  **29 U.S.C. § 794;**
22 MAUREEN MCCOY,                       )
                                        )  **2) VIOLATION OF DEPARTMENT**
23            *Plaintiffs*,             )  **OF EDUCATION REGULATIONS**
                                        )  **REGARDING "LOCATION AND**
24       v.                             )  **NOTIFICATION," 34 C.F.R.**
                                        )  **§ 104.32;**
25 COMPTON UNIFIED SCHOOL               )
   DISTRICT; DARIN BRAWLEY, in his      )  **3) DEPARTMENT OF EDUCATION**
26                                      )  **REGULATIONS REGARDING**
27
28

FILED
CLERK, U.S. DISTRICT COURT
MAY 18 2015
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

PAID
MAY 18 2015
Clerk, US District Court
COURT 4612

| | | |
|---|---|---|
| 1 | official capacity as Superintendent of | ) **"PROCEDURAL SAFEGUARDS,"** |
| 2 | Compton Unified School District; | ) **34 C.F.R. § 104.36;** |
| | MICAH ALI, SATRA ZURITA, | ) **4) DEPARTMENT OF EDUCATION** |
| 3 | MARGIE GARRETT, CHARLES | ) **REGULATIONS REGARDING** |
| 4 | DAVIS, SKYY FISHER, EMMA | ) **"FREE APPROPRIATE PUBLIC** |
| | SHARIF, and MAE THOMAS, in their | ) **EDUCATION," 34 C.F.R. § 104.33;** |
| 5 | official capacities as members of the | ) **AND** |
| 6 | Board of Trustees of Compton Unified | ) |
| | School District, | ) **5) AMERICANS WITH** |
| 7 | | ) **DISABILITIES ACT, 42 U.S.C.** |
| 8 | *Defendants.* | ) **§ 12101 ET SEQ.** |
| | | ) |
| 9 | | ) **DEMAND FOR JURY TRIAL** |
| 10 | | |

1  Students Peter P., Kimberly Cervantes, Phillip W., Virgil W., and Donte J.,
2  ("Student Plaintiffs") on behalf of themselves and all others similarly situated, along
3  with teachers Rodney Curry, Armando Castro II, and Maureen McCoy (collectively,
4  "Plaintiffs") bring this action against Compton Unified School District ("CUSD"),
5  Darin Brawley, in his official capacity as Superintendent of CUSD, and Micah Ali,
6  Satra Zurita, Margie Garrett, Charles Davis, Skyy Fisher, Emma Sharif, and Mae
7  Thomas, in their official capacities as members of the Board of Trustees of CUSD
8  (collectively, "Defendants").   Plaintiffs' allegations against Defendants are based
9  upon information and belief unless otherwise indicated.   Plaintiffs allege as follows
10 in this federal question action, over which this Court has jurisdiction pursuant to 28
11 U.S.C. § 1331.

12                                  **INTRODUCTION**

13      1.    Decades of research have proven that children who grow up in high-
14 poverty neighborhoods characterized by minimal investment in schools, quality
15 housing, after-school programs, parks, and other community resources are
16 disproportionately likely to be exposed to trauma and complex trauma.[1]  Trauma
17 stems from such causes as exposure to violence and loss, family disruptions related
18 to deportation, incarceration and/or the foster system, systemic racism and
19 discrimination, and the extreme stress of lacking basic necessities, such as not
20 knowing where the next meal will come from or where to sleep that night.  Complex
21 trauma stems from the exposure to multiple persistent sources of violence, loss, and
22 other adverse childhood experiences ("ACEs"), and describes children's exposure to
23 these events and the impact of this exposure.[2]    Children in high-poverty

---

24

25  [1] The terms "trauma" and "complex trauma" are often used interchangeably in
26  this complaint, and although a child can be profoundly affected by one traumatic
27  experience, the Student Plaintiffs are all victims of complex trauma, which also is
    the subject of most of the academic literature cited.

28  [2] The Centers for Disease Control and Prevention ("CDC") defines ACEs as
    childhood abuse, neglect, and exposure to other traumatic stressors.  The CDC's

neighborhoods are also overwhelmingly concentrated in schools that fail to meet the educational and mental health needs of trauma-affected students. Young people living in the communities with the fewest resources are thus both more likely to be exposed to trauma and less likely to receive the interventions needed to cope with that trauma. This dual assault greatly increases the likelihood of long-term and devastating harm to the educational success and emotional well-being of these young people.

2. How young people react to trauma depends on the age of the child, the severity of the trauma, their proximity to it, and their individual coping mechanisms. A child experiencing trauma or abuse develops strategies, which become coping mechanisms to enable day-to-day functioning, but medical science has made clear that cumulative exposure to trauma—particularly when it goes unaddressed—is likely to disable a child's ability to learn. Trauma incapacitates by altering the physiology of a child's developing brain, creating a neurobiological response that impairs the performance of daily activities, especially skills essential to receiving an education such as thinking, reading, concentrating, learning and regulating emotions.

3. Education, mental health, and medical research have established that, without appropriate interventions, complex trauma can have a devastating effect, including among children who do not exhibit symptoms sufficient to merit diagnosis of a clinically-significant trauma-related disorder. Studies have shown, for example, that when controlling for other factors, children exposed to violence have decreased reading ability, lower grade-point averages (GPA), more days of school absence, and decreased rates of high school graduation.[3] Exposure to two or more traumas

web site includes a discussion of a number of studies linking ACEs to children's later-life health and well-being.

[3] Sheryl Kataoka et al., *Violence Exposure and PTSD: The Role of English Language Fluency in Latino Youth*, 18 J. Child. Fam. Stud. 334, 335 (2009)

1    makes a student 2.67 times more likely to repeat a grade or be disengaged with
2    school.[4] In short, unaddressed trauma is a powerful predictor of academic failure.[5]

3         4.      Schools are obliged under the Rehabilitation Act and Americans with
4    Disabilities Act to accommodate students who are being denied benefits of
5    educational programs solely by reason of experiencing complex trauma.  Schools
6    must intervene early and consistently according to professional standards in order to
7    ensure that trauma does not determine a young person's educational attainment and
8    life chances.

9         5.      Experiences in California and across the country have repeatedly
10   shown that appropriate interventions, which teach skills proven to bolster the
11   resilience of young people, can effectively accommodate the disabling effects of
12   trauma.  This gives students affected by trauma meaningful access to the public
13   education they deserve.  Experts agree that to effectively provide reasonable
14   accommodations to students whose learning is impaired by complex trauma,
15   particularly in schools that serve high concentrations of trauma-impacted students,
16   access to an individualized plan is insufficient.  Rather, implementation of
17   schoolwide trauma-sensitive practices that create an environment in which students
18   are able to learn is required.

19

20   (hereinafter "Violence Exposure and PTSD"); *see also* Nadine J. Burke et al., *The*
21   *Impact of Adverse Childhood Experiences on an Urban Pediatric Population*, 35
     Child Abuse & Neglect 408 (2011) (hereinafter "Impact").
22
          [4] Christina D. Bethell et al., *Adverse Childhood Experiences: Assessing the*
23   *Impact on Health and School Engagement and the Mitigating Role of Resilience*,
24   33:12 Health Affairs 2106, 2111 (hereinafter "Adverse Childhood Experiences").

25        [5] Christopher Blodgett, *Adopting ACEs Screening and Assessment in Child*
     *Serving Systems* (working paper), Ex. 1 at 8, 9, 12, 14, 15, 25, 26 (hereinafter
26   "Adopting ACEs"); Christopher Blodgett, *No School Alone: How Community Risks*
     *and Assets Contribute to School and Youth Success*, Report to the WA State Office
27   of Financial Management in response to Substitute House Bill 2739 (March 2015),
28   Ex. 2 at 4-6, 24-26, 28, 65  (hereinafter "No School Alone").

6.      There exists broad consensus around the core components of such trauma-sensitive schools: (1) training educators to recognize, understand, and proactively recognize and address the effects of complex trauma, in part through building students' self-regulation and social-emotional learning skills; (2) developing restorative practices to build healthy relationships and resolve conflicts peacefully and avoid re-traumatizing students through the use of punitive discipline; and (3) ensuring consistent mental health support is available to appropriately meet student needs.  Together, these whole-school practices can create a safe, consistent, and supportive learning environment to contribute to the healing process and enable students exposed to trauma to learn.

7.      There are devastating consequences to educational opportunity and academic success that flow from a failure to make reasonable accommodations to the needs arising in schools attended by high concentrations of trauma-impacted students.  Moreover, the evidence shows that whole-school approaches work to mitigate the disabling consequences of complex trauma.  Despite this, Defendants have ignored and affirmatively breached their responsibility to accommodate students whose access to education is fundamentally impaired by reason of the trauma they have endured.  CUSD does not train and sensitize teachers or administrative personnel to recognize, understand, and address the effects of complex trauma.  Without such training, CUSD is unable to appropriately identify trauma-impacted students in need of more intensive support and notify their parents or guardians.  Nor do teachers and staff receive training in evidence-based trauma interventions that have been demonstrated to reduce the effects of trauma.  Likewise, CUSD does not notify parents of its obligation to identify and provide accommodations to students whose learning may be impaired due to the experience of trauma.  It does not implement restorative practices necessary to support healthy relationships.  It does not address conflict and violence in a manner that recognizes the impact of complex trauma on the ability to self-regulate in high stress or anxiety

1   situations.  Moreover, mental health support is either entirely unavailable or grossly

2   insufficient to meet student needs related to trauma.

3       8.      Instead of providing these and other accommodations to address

4   complex trauma, Defendants subject trauma-impacted students to punitive and

5   counter-productive suspensions, expulsions, involuntary transfers, and referrals to

6   law enforcement that push them out of school, off the path to graduation, and into

7   the criminal justice system.

8       9.      In *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), the U.S. Supreme Court

9   famously recognized "the importance of education to our democratic society." *Id.* at

10  493.  Public education is "required in the performance of our most basic public

11  responsibilities," "the very foundation of good citizenship," and "a principal

12  instrument in awakening the child to cultural values, in preparing him for later

13  professional training, and in helping him to adjust normally to his environment." *Id.*

14  Indeed, "it is doubtful that any child may reasonably be expected to succeed in life if

15  he is denied the opportunity of an education." *Id.*   More than sixty years later,

16  students in CUSD who are affected by the disabling impacts of complex trauma still

17  lack meaningful access to this most basic of opportunities.  These students are

18  entitled to the accommodations necessary such that the trauma to which they have

19  been disproportionately and unjustly subjected is not determinative of their

20  educational success and life chances.

21      10.     As discussed above, trauma occurs when overwhelmingly stressful

22  events undermine a person's ability to cope.[6]  The term "complex trauma" describes

23

24      [6] Lenore C. Terr, *Childhood Traumas: An Outline and Overview*, 148 Am. J.

25  Psychiatry 10, 11 (1991) (defining childhood trauma as the impact of external forces

26  that "[render] the young person temporarily helpless and [break] past ordinary

    coping and defensive operation …. [This includes] not only those conditions marked

27  by intense surprise but also those marked by prolonged and sickening

    anticipation."); Judith Herman, *Trauma and Recovery* 33 (Basic Books 1997)

28  (explaining that traumatic events "overwhelm the ordinary human adaptations to

- 5 -

children's exposure to multiple traumatic events, often of an invasive, interpersonal nature, and the wide-ranging, long-term impact of this exposure.[7]   Humans are ordinarily able to process the myriad stresses of everyday life, but when confronted with experiences so severe that they produce feelings of terror and helplessness, or with so many repeated small and large psychological cuts to a developing brain that it forms a deep wound,[8] a person's ability to adapt to these stresses can become overwhelmed.   This is especially true for children, whose brains are still organizing and developing[9] and who have yet to establish their baseline equilibrium.[10]   Thus, even when a traumatic event is over, the effect on the child and the child's reaction to it is not.

11.   The effects of trauma on development and social and educational needs of children vary.   For some children, there may be only brief distress following a

---

life … .   They confront human beings with the extremities of helplessness and terror.").

[7] Bruce D. Perry & Ronnie Pollard, *Homeostasis, Stress, Trauma, and Adaptation: A Neurodevelopmental View of Childhood Trauma*, 7 Child Adolesc. Psychiatr. Clin. N. Am., 33, 36 (1998) (hereinafter "Homeostasis"); *Effects of Complex Trauma*, The National Child Traumatic Stress Network, http://www.nctsnet.org/trauma-types/complex-trauma (last visited May 16, 2015).

[8] *Homeostasis, supra* note 7, at 34-36, 45-46.

[9] Bruce D. Perry et al., *Childhood Trauma, the Neurobiology of Adaptation, and "Use-dependent" Development of the Brain: How "States" Become "Traits,"* 16 Infant Ment. Health J. 271, 276 (1995) (hereinafter "How 'States' Become 'Traits'") ("[T]he organizing, sensitive brain of an infant or young child is more malleable to experience than a mature brain.   Although experience may alter the behavior of an adult, experience literally provides the organizing framework for an infant and child.").

[10] *Homeostasis, supra* note 7, at 36; Bruce D. Perry, *Stress, Trauma and Post-traumatic Stress Disorders in Children: An Introduction*, The Child Trauma Academy 5 (2007) (hereinafter "Stress"), *available at* https://childtrauma.org/wp-content/uploads/2013/11/PTSD_Caregivers.pdf ("[T]he rates of children developing PTSD following traumatic events are higher than those reported for adults.").

traumatic event, without significant impairment in functioning.  For others, trauma-related symptoms appear soon after a traumatic event and may persist indefinitely, often manifested by significant distress and/or impairment.  For some youth, these effects will lead to significant developmental disruption and consequent educational loss, even if they do not meet the threshold for a diagnosable mental health disorder. Most children exposed to violence, abuse, and neglect display symptoms of psychological trauma,[11] and at least half develop "significant neuropsychiatric symptomatology."[12]     Other children will develop diagnosable mental health disorders as a result of exposure to trauma.  For example, research has shown that a substantial minority of children exposed to violence develops clinically significant post-traumatic stress disorder ("PTSD")[13] and has linked trauma with mental health conditions such as conduct disorder, ADHD, anxiety disorders, dissociative disorders, somatoform disorders, major depression, schizophrenia, and substance abuse and dependence.[14]  Children exposed to sudden and unexpected violence, such as community violence, are especially vulnerable.[15]

12.    For youth of color and for youth who identify as LGBT, racism, homophobia, and marginalization further compound trauma, increase the likelihood of trauma, and may intensify the effects of any victimization.

---

[11] Steven P. Cuffe et al., *Prevalence of PTSD in a Community Sample of Older Adolescents*, 37 J. Am. Acad. Child Adolesc. Psychiatry 147 (1998); Karyn Horowitz et al., *PTSD Symptoms in Urban Adolescent Girls: Compounded Community Trauma*, 34 J. Am. Acad. Child Adolesc. Psychiatry 1353 (1995).

[12] *How "States" Become "Traits," supra* note 9, at 273.

[13] Bradley D. Stein et al., *A Mental Health Intervention for Schoolchildren Exposed to Violence: A Randomized Controlled Trial*, 290 J. Am. Med. Ass'n 603, 603 (2003) (hereinafter "Mental Health Intervention").  Controlled studies indicate that between 15% and 90% of children exposed to traumatic events develop clinical PTSD. *Stress, supra* note 10, at 5.

[14] *Homeostasis, supra* note 7, at 45.

[15] *How "States" Become "Traits," supra* note 9, at 273.

13.    This action is brought in part by the Student Plaintiffs who attend schools in CUSD and have been denied meaningful access to public education as a result of Defendants' practices and policies that fail to accommodate the effects of complex trauma.   Even worse, these policies and practices perpetuate and sometimes create trauma on their own.

14.    **Plaintiff Peter P.** is seventeen years old and is enrolled at Dominguez High School in CUSD.  In the early years of Peter P.'s life, his biological mother abused drugs, and he was repeatedly physically and sexually abused by his mother's boyfriends.  He also witnessed physical abuse of his siblings and mother.  He continues to have flashbacks to this period and often experiences an instinct to be aggressive when he sees a male approaching him.

15.    When Peter P. was about five years old, he and his siblings were removed from the home of their biological mother and entered the foster system. Peter P. was initially separated from most of his siblings and moved in and out of a series of foster homes.  Peter P. was occasionally sent back to live with his biological mother for a few weeks before being removed from her home again. When Peter P. was about ten or eleven years old, the rights of his biological mother were terminated, and he and some of his siblings were adopted.  Peter P.'s adoptive mother's health worsened when Peter P. was sixteen, and he became a caretaker for her and his younger siblings.

16.    Peter P. has witnessed and been the victim of violence on multiple occasions.  Peter P. reports that in middle school he watched as his best friend was shot and killed.  In 2014, Peter P. received stab wounds and required stitches after he threw himself in front of a friend whose relative was attacking her with a knife. Peter P. reports that he has witnessed more than twenty people get shot.

17.    Peter P.'s two older brothers are currently incarcerated.  The man who was living with his mother and serving as a caretaker for Peter P. and his siblings at the time they entered the foster system is also currently in prison for murder.

18.    Peter P. was homeless for two months in March and April 2015. During this period, he slept on the roof of the Dominguez High School cafeteria. At no time did administrators provide any support or services.   Instead, he was suspended. Although some personnel were aware of these circumstances, Peter P.'s attempts to return to school were denied, and he was threatened with law enforcement involvement if he persisted in attempting to return.

19.    As a result of the repeated and sustained trauma that Peter P. has endured, he often experiences uncontrollable anger. "My anger is not normal," he says. "Sometimes I believe my aura is wicked. Sometimes I believe I have a demon in me." Peter P. also feels deep sadness and depression.  He says: "Sometimes I pray to God, why do you still keep me here even after all the things I've been through?  I have had so many chances to go to heaven but I'm still here.  I thank God every day for waking up, but I regret waking up every day."

20.    Because CUSD does not have a system of accommodations and modifications to address the impact of complex trauma, Peter P. has been unable to access his education. Although Peter P. previously had shown an ability to achieve high grades in certain honors classes, complex trauma in his life has at times caused his grades to decline sharply.  He is currently failing all but two classes, which causes him to feel deep shame.  Although he has repeatedly missed classes due to the complex trauma he has experienced, no mental health or attendance counselor or other school official has intervened or inquired as to the cause of these absences. CUSD has also repeatedly subjected Peter P. to harsh punitive discipline.  Over the course of his academic career, he has been repeatedly suspended for disobedient, angry, or aggressive behavior, and has been involuntarily transferred (or "expelled") from all of the following CUSD schools: Roosevelt Elementary School, Clinton Elementary School, Kelly Elementary School, Bunche Elementary School and Bunche Middle School, Roosevelt Middle School, and Davis Middle School.  Most

1   of these "expulsions" stemmed from physical altercations and misbehavior caused

2   by unaddressed anger and aggression related to trauma.

3        21.    **Plaintiff Kimberly Cervantes** has been a senior at Cesar Chavez

4   Continuation School in CUSD since October 2014.   From August 2011 until

5   October 2014, Kimberly was a student at Dominguez High School and before that

6   she attended Whaley Middle School and Roosevelt Elementary School, all in

7   CUSD.  After attending Roosevelt and before attending Whaley, Kimberly attended

8   Rowland Elementary School in West Covina for one year.   While at Rowland,

9   Kimberly experienced multiple incidents of racism.

10       22.    Kimberly has experienced multiple traumas during school hours that

11  have contributed to difficulties with attendance.   As a middle school student at

12  Whaley, Kimberly witnessed the deaths of two students.   While at Dominguez,

13  Kimberly told a fellow student that she identified as bisexual only to be told by the

14  teacher, in front of the whole class, that she "shouldn't be gay" and that it was

15  "wrong."  Already dealing with suicidal feelings, Kimberly stopped attending the

16  class.  Largely as a consequence of the credits she missed during this time period,

17  Kimberly ultimately had to transfer to Chavez Continuation School at the beginning

18  of her senior year.

19       23.    In October of her senior year, Kimberly got into an altercation with a

20  security guard at Dominguez while returning a book to the library that resulted in

21  feelings of terror and serious injuries to Kimberly's back.   As a result of the

22  incident, Kimberly did not attend school for over a week.  Although Kimberly and

23  her family filed a formal complaint with the school and attempted to press charges,

24  Kimberly received no services or acknowledgement of the incident.

25       24.    After transferring to Chavez, Kimberly was sexually assaulted on the

26  public bus on her way home from school.   The experience left her traumatized and

27  terrified of traveling to and from Chavez.  She again missed multiple days of school,

28

1  and when she did attend, flashbacks caused her to break down in class.  Although
2  the school is aware of the incident, she has yet to receive mental health services.

3      25.    Kimberly's access to mental health support has been inconsistent and
4  wholly lacking during times of acute and urgent need.  Although CUSD referred her
5  to Shields for Families for counseling services when she was in elementary school,
6  by the time she reached high school she was told that she had "used up" her five
7  years of free services and would have to start paying if she wanted to continue
8  therapy.  Kimberly felt that she needed the mental health services more than ever,
9  but her family could not afford to pay, and her counseling sessions were terminated.
10  Although Kimberly read a poem at a school talent show in high school discussing
11  her struggles with suicidal feelings, she never received any mental health services.

12     26.    Because CUSD does not have a system of accommodations and
13  modifications to address the impact of complex trauma, Kimberly has been unable
14  to access her education.  Due to unaddressed trauma, Kimberly had trouble focusing
15  and concentrating in class and has missed a significant amount of class.  As a result,
16  she struggled in school and failed numerous courses; she was compelled to transfer
17  to a continuation school and will not have the opportunity to graduate from one of
18  Compton's mainstream high schools.

19     27.    **Plaintiff Phillip W.** is fifteen years old and currently attends Team
20  Builders, an alternative high school in CUSD.   Phillip W. has repeatedly
21  experienced traumatic violence and loss.  When Phillip W. was eight years old, a
22  bullet went through the rear window of his mother's car when he was sitting in the
23  back seat; Phillip W. believes he would have been killed if he had been sitting up
24  higher in his seat.  Phillip W. also first witnessed someone shot and killed when he
25  was eight years old.  After witnessing that first shooting, Phillip W. cried and threw
26  up.  He estimates that he has since witnessed more than twenty further shootings.
27  He has had guns fired at him on more than one occasion, and has been caught in
28  crossfire approximately eight times.  In 2014, Phillip W. was hit in the knee by a

1    ricocheting bullet.  Also during 2014, Phillip W. was chased and shot at by the
2    police when he and his friends were playing basketball on the court of his old
3    elementary school campus in the evening.  On another occasion, when Phillip W.
4    was playing tag with friends in a Compton park, a police officer pointed a gun at
5    him and told him to freeze until the officer realized that he had mistaken Phillip W.
6    for someone else.

7        28.    In the past year, Phillip W. has experienced the deaths of two close
8    friends—one of whom he witnessed get shot in the head last September.  He also
9    lost a close family member to cancer.

10       29.    As a result of the complex trauma he has experienced, Phillip W. has
11   difficulty focusing, concentrating, and recalling information in school.  Phillip W.
12   feels detached or angry much of the time.  Phillip W. says, "When I was about
13   twelve, I felt a click in my head and something changed.  I used to be happy and
14   joyful, but now I can't be happy.  I have to be serious and ready for anything."  He
15   frequently jokes around during school to distract himself from thinking about the
16   past.  Phillip W. says that his main goal is "to make it past twenty-five."

17       30.    Because CUSD does not have a system of accommodations and
18   modifications to address the impact of complex trauma, Phillip W. has not been able
19   to access his education.  Despite Phillip W.'s acute need for additional and more
20   intensive support, no CUSD school has ever provided or referred him to mental
21   health services.  At age thirteen, Phillip W. became involved in the juvenile justice
22   system, which contributed further to the impact of the trauma he has experienced
23   and his resultant educational losses.

24       31.    Although Phillip W. is only in his first year of high school, CUSD—
25   rather than providing him with meaningful accommodations and modifications—has
26   already "expelled" Phillip W. from all three of its mainstream high schools because
27   his unaddressed anger related to trauma caused him to enter into physical
28   altercations with other students.  He has most recently been removed from

1  Dominguez High School, and is attending Team Builders—a CUSD alternative
2  school that is only in session for half of the school day and has no mental health
3  support—where he continues to struggle without appropriate support.

4       32.  **Plaintiff Virgil W.** is Phillip W.'s twin brother, and is a fifteen-year-
5  old student at Dominguez High School in CUSD.  When Virgil W. was
6  approximately three years old, he woke up during the night to the sight of his father
7  pointing a gun at his mother and yelling, "I'm done."  Virgil W. continues to have
8  terrifying nightmares linked to this incident.  After that night, he says, "the part of
9  my brain that processes fear sort of shut down."  Virgil W. has also recently
10 experienced the death of a close friend and a cousin, and nearly lost another close
11 friend and cousin.

12      33.  Because CUSD does not have a system of accommodations and
13 modifications to address the impact of complex trauma, Virgil W. has not been able
14 to access his education and make sufficient academic, social, and emotional
15 progress.  Virgil W. struggles with anger due to the traumatic violence and loss he
16 has endured.  Virgil W. says, "I know I have anger problems.  Up until I was in
17 seventh grade, there was no limit.  I was kind of scared of myself for a while."  As a
18 direct and proximate result of this anger, Virgil W. got into fights in the classroom
19 or schoolyard.  Instead of providing the necessary support to Virgil W., CUSD has
20 responded with punitive discipline and police involvement.  In sixth grade, Virgil
21 W. was "expelled" from Enterprise Middle School in CUSD and became involved
22 with the juvenile justice system as a result of one such altercation.  Virgil W. has
23 been repeatedly suspended, and this year he was "expelled" out of Centennial High
24 School.  Despite Virgil W.'s need for additional and more intensive support, no
25 CUSD school has ever provided or referred him to mental health services.

26      34.  **Plaintiff Donte J.** is thirteen years old and currently attends Whaley
27 Middle School in CUSD.  When Donte J. was in sixth grade he moved to Compton
28 from Culver City.  That year, he was arrested at gunpoint on the campus of

1   Roosevelt Elementary School in CUSD and taken to the station in handcuffs when
2   police mistook him for someone else.

3       35.    During the first semester of this school year, an assailant pulled out a
4   knife and threatened to stab Donte J. and a friend as they were leaving the school
5   campus. During the second semester, a group of young men assaulted Donte J. on
6   his way to school for wearing "gang colors," despite Donte J.'s lack of involvement
7   with any gang. Despite going to the school nurse and explaining the incident and
8   being sent home, Donte J. never received any counseling concerning this traumatic
9   experience.

10       36.    Because CUSD does not have a system of accommodations and
11   modifications to address the impact of complex trauma, Donte J. has been denied
12   access to his education. He has had difficulty focusing in class following these
13   traumatic events due to intrusive thoughts, and was recently suspended for
14   slamming the door to the counselor's office when he tried to request help and felt
15   that he was getting none.

16       37.    The experiences of the Student Plaintiffs are far from unique among
17   CUSD students. CUSD serves under-resourced neighborhoods in which community
18   violence is disproportionately prevalent. CUSD is comprised of high numbers of
19   foster and homeless youth, and nearly exclusively students of color who experience
20   the expression and consequences of racism. Defendants are accordingly on notice
21   that CUSD schools serve a disproportionately high number of students exposed to
22   complex trauma. Concentrating many significantly trauma-impacted students in a
23   school creates the highest level of need, necessitating the implementation of
24   intensive systems of interventions.

25       38.    Defendants' failure to provide support necessary to accommodate
26   student trauma also has significant mental health impact on educators. Plaintiffs
27   Rodney Curry, Armando Castro II, and Maureen McCoy are just a few of the many
28   empathetic and compassionate teachers and staff in CUSD schools who must devote

a great deal of time and emotional resources to addressing student trauma.  In many cases, they lack the training, resources, and support necessary to do so.  For some CUSD teachers, the overwhelming energy it takes to manage a class of students manifesting the consequences of unaddressed trauma without the appropriate resources or training leads to "burnout."  Other educators actually begin to take on the trauma themselves, displaying similar symptoms to their students.  This "secondary traumatic stress" creates serious health consequences for the educator.  Both burnout and secondary traumatic stress predictably lead to administrator and teacher turnover and contribute to further instability at CUSD school sites.

39.     Defendants have failed to put systems of accommodation in place to accommodate the high concentration of trauma-impacted students in CUSD schools, instead relying upon an ineffective and counterproductive approach of punitive school removals, which further diverts students from learning and pushes students off the path to graduation.  The failure of Defendants to properly account for the disabling impact of complex trauma results in students with the greatest needs and vulnerabilities being effectively denied access to education.

## PARTIES

*Plaintiffs*

40.     Plaintiff Peter P. is seventeen years old and resides in Los Angeles County within the boundaries of CUSD and Dominguez High School.  Plaintiff Peter P. attends Dominguez High School and is legally required to attend school. The effects of the complex trauma Plaintiff Peter P. has experienced have impaired his access to public education, as described above in Paragraphs 14 through 20. During his academic career, Plaintiff Peter P. has been subject to involuntary removal from at least six CUSD schools, including Roosevelt Elementary School, Emerson Elementary School, Kelly Elementary School, Bunche Elementary School and Bunche Middle School, and Davis Middle School.  Carolina Melendrez has

1  concurrently filed an application with the Court to act as Peter P.'s guardian ad

2  litem.

3      41.    Plaintiff Kimberly Cervantes is eighteen years old and resides in Los

4  Angeles County within the boundaries of CUSD and Dominguez High School.

5  Plaintiff Kimberly Cervantes attends Cesar Chavez Continuation School and is

6  legally required to attend school.  The effects of the complex trauma Kimberly

7  Cervantes has experienced have impaired her access to public education, as

8  described above in Paragraphs 21 through 26.

9      42.    Plaintiff Phillip W. is fifteen years old and resides in Los Angeles

10  County within the boundaries of CUSD and Compton High School.  Plaintiff Phillip

11  W. is legally required to attend school.  The effects of the complex trauma Plaintiff

12  Phillip W. has experienced have impaired his access to public education, as

13  described above in Paragraphs 27 through 31.  During the 2014-2015 school year,

14  Plaintiff Phillip W. was involuntarily removed from Compton High School,

15  Centennial High School, and is currently in expulsion procedures from Dominguez

16  High School.  Plaintiff Phillip W. currently attends school at Team Builders, an

17  alternative school in CUSD.  The legal guardian of Phillip W. has concurrently filed

18  an application with the Court to act as Phillip W.'s guardian ad litem.

19      43.    Plaintiff Virgil W. is fifteen years old and resides in Los Angeles

20  County within the boundaries of CUSD and Compton High School.  Plaintiff Virgil

21  W. attends Dominguez High School and is legally required to attend school.  The

22  effects of the complex trauma Plaintiff Virgil W. has experienced have impaired his

23  access to public education, as described above in Paragraphs 32 through 33.  During

24  the 2014-2015 school year, Plaintiff Virgil W. was involuntarily removed from

25  Centennial High School, and during the 2011-2012 school year, Plaintiff Virgil W.

26  was involuntarily removed from Enterprise Middle School.  The legal guardian of

27  Virgil W. has concurrently filed an application with the Court to act as Virgil W.'s

28  guardian ad litem.

44.     Plaintiff Donte J. is thirteen years old and resides in Los Angeles County within the boundaries of CUSD and Whaley Middle School.  Plaintiff Donte J. attends Whaley Middle School and is legally required to attend school.  The effects of the complex trauma Plaintiff Donte J. has experienced have impaired his access to public education, as described above in Paragraphs 34 through 36.  The legal guardian of Donte J. has concurrently filed an application with the Court to act as Donte J.'s guardian ad litem.

45.     Plaintiff Rodney Curry is a teacher at Dominguez High School in CUSD.  Plaintiff Curry has been teaching at Dominguez High School for nineteen years.  In that time, Plaintiff Curry has lost dozens of students to violence and attended their funerals.  Even more of Plaintiff Curry's students have been shot or have witnessed or experienced traumatic violence but survived.  Because he must teach children who experience complex trauma, Plaintiff Curry is affected by, and has an interest in, Defendants' failure to provide reasonable accommodations for CUSD students.  Students in Plaintiff Curry's classes are hindered in their ability to learn by the effects of complex trauma.  Because of Defendants' failure to accommodate students suffering from complex trauma, Plaintiff Curry exerts significant additional effort both in teaching and in managing his classroom.  Plaintiff Curry also experiences substantial emotional distress from observing the effects that unaddressed complex trauma has on his students' lives.  Furthermore, Plaintiff Curry spends his own money and personal time in attempting to alleviate the effects of complex trauma on his students, although he is not required to do so and has received no training or resources from CUSD.

46.     Plaintiff Armando Castro II is a teacher at Cesar Chavez Continuation School in CUSD.  Plaintiff Castro has been teaching at Cesar Chavez Continuation School for eight years.  In that time, Plaintiff Castro has witnessed significant violence take place in and around the school. Plaintiff Castro has multiple students who have lost family members to violence or who have family members who are

1 incarcerated.  Many current and former students of Plaintiff Castro die every year as
2 a consequence of violence in the community.  Plaintiff Castro believes that other
3 high schools in the district send students who are acting out unaddressed complex
4 trauma to the continuation school, but that the continuation school does not have
5 sufficient mental health resources to help those students.  Because he must teach
6 children who experience complex trauma, Plaintiff Castro is affected by, and has an
7 interest in, Defendants' failure to provide reasonable accommodations for CUSD
8 students.  Students in Plaintiff Castro's classes are hindered in their ability to learn
9 by the effects of complex trauma.  Because of Defendants' failure to accommodate
10 students suffering from complex trauma, Plaintiff Castro exerts significant
11 additional effort both in teaching and in managing his classroom.  Plaintiff Castro
12 also experiences substantial emotional distress from observing the effects that
13 unaddressed complex trauma has on his students' lives.

14      47.   Plaintiff Maureen McCoy is a teacher at Centennial High School in
15 CUSD.  Plaintiff McCoy has been teaching at Centennial High School for six years.
16 She is a certified school psychologist.  Plaintiff McCoy has counseled students
17 dealing with foster care, death, teen pregnancy, and sexual abuse.  Plaintiff McCoy's
18 students often tell her that they are scared walking to and from school.  For example,
19 earlier this year, a female student told Plaintiff McCoy that she felt she had to carry
20 a knife as she walked to school to feel safe.  Plaintiff McCoy started at Centennial in
21 the middle of the semester, after her classes had gone through four to five substitute
22 teachers.   Plaintiff McCoy has requested assistance from administrators for
23 additional support in addressing student behavior, but her additional requests have
24 been ignored.  During her first year at Centennial, Plaintiff McCoy was bullied by
25 students.  Plaintiff McCoy has experienced significant health problems and was
26 placed on disability leave by her doctor as a result of her attempts to meet the needs
27 of CUSD students who have experienced trauma without the training, resources, or
28 support to do so.  This stress and lack of support has also led to Plaintiff McCoy's

need to take sick days on several occasions. Because she must teach children who experience complex trauma, Plaintiff McCoy is affected by, and has an interest in, Defendants' failure to provide reasonable accommodations for CUSD students. Students in Plaintiff McCoy's classes are hindered in their ability to learn by the effects of complex trauma. Because of Defendants' failure to accommodate students suffering from complex trauma, Plaintiff McCoy exerts significant additional effort both in teaching and in managing her classroom. Plaintiff McCoy also experiences substantial emotional distress from observing the effects that unaddressed complex trauma has on her students' lives.

*Defendants*

48.    Defendant CUSD operates schools in the south central region of Los Angeles County and encompasses the city of Compton and portions of the cities of Carson and Los Angeles. The school district serves nearly 26,000 students at forty sites, including twenty-four elementary schools, eight middle schools, three high schools, and five alternative schools. CUSD is headquartered at 501 South Santa Fe Avenue, Compton, California, 90221. CUSD receives federal funds.

49.    Defendant Darin Brawley is the superintendent of CUSD. Defendant Brawley exercises supervision and control over the daily activities of CUSD. *See* Cal. Educ. Code § 35035 (powers and duties of superintendent). Defendant Brawley is aware, or should be aware, of the impact of complex trauma on the ability of class members to obtain the benefits of public education.

50.    Defendants Micah Ali, Satra Zurita, Margie Garrett, Charles Davis, Skyy Fisher, Emma Sharif, and Mae Thomas are members of the Board of Trustees of CUSD. Defendants Ali, Zurita, Garrett, Davis, Fisher, Sharif, and Thomas exercise control over the actions of CUSD teachers, principals, and support staff. *See* Cal. Educ. Code § 35020 ("The governing board of each school district shall fix and prescribe the duties to be performed by all persons in public school service in the school district."). Defendants Ali, Zurita, Garrett, Davis, Fisher, Sharif, and

1 | Thomas are aware, or should be aware, of the impact of complex trauma on the
2 | ability of class members to obtain the benefit of public education.

3 | **JURISDICTION AND VENUE**

4 |     51.     The Court has subject matter jurisdiction over this case pursuant to
5 | 28 U.S.C. § 1331 because it arises under the laws of the United States.

6 |     52.     This Court has personal jurisdiction over Defendants because CUSD is
7 | headquartered within this district; the CUSD schools at issue are located within this
8 | district; because the individual defendants are domiciled in this district; and because
9 | Defendants' actions and omissions took place within this district.

10 |     53.     Venue is proper in this federal district pursuant to 28 U.S.C. § 1391(b)-
11 | (c).

12 | **CLASS ACTION ALLEGATIONS**

13 |     54.     This action is maintainable as a class action under Federal Rule of Civil
14 | Procedure 23.

15 |     55.     The Student Plaintiffs Peter P., Kimberly Cervantes, Phillip W., Virgil
16 | W., and Donte J. represent a class consisting of current and future students enrolled
17 | in CUSD who have experienced or will experience complex trauma that
18 | substantially limits major life activities, including learning, reading, concentrating,
19 | thinking, and/or communicating, and who have not received reasonable
20 | accommodations that would enable them to receive the benefits of CUSD's
21 | educational programs. The class includes, but is not limited to, students with
22 | trauma-related conditions recognized by the Diagnostic and Statistical Manual of
23 | Mental Disorders, Fifth Edition (DSM-5), including post-traumatic stress, anxiety,
24 | dissociative, conduct, somatoform, depressive, and substance-related and addictive
25 | disorders.

26 |     56.     There exist questions of law and/or fact common to the entire student
27 | class that predominate over any individual question. Common questions of fact and
28 | law include, without limitation:

- Whether the effects of complex trauma can substantially limit one or more of a student's major life activities, including learning, reading, concentrating, thinking, and communicating.

- Whether such interference with education-related life activities impairs a student's ability to receive the benefits of a public education.

- Whether students affected by complex trauma enrolled in schools in CUSD are denied the benefits of a public education at least in part due to the effects of experiencing complex trauma.

- Whether students affected by complex trauma enrolled in schools in CUSD are denied the benefits of a public education solely by reason of their trauma.

- Whether accommodations exist that can be reasonably implemented by Defendants to ensure that students with complex trauma do have meaningful access to a public education.

- Whether Defendants have failed to consistently implement such accommodations.

57.    Each student member of the class has claims that are typical of the claims of the class. Each Student Plaintiff is a member of the class he or she seeks to represent.   The Student Plaintiffs and the student class members have all experienced complex trauma that substantially limits major life activities, including learning, reading, concentrating, thinking, and/or communicating.   Moreover, as result of Defendants' acts, omissions, policies, and procedures that apply to Student Plaintiffs and all student class members, Student Plaintiffs and the student class members are denied benefits of a public education.

58.    The class is so numerous that joinder of all members of individual actions by each class member is impracticable.  Because CUSD serves a student population that is highly likely to be exposed to complex trauma, including violence, loss of a loved one, removal from home and placement in the foster system, homelessness and extreme socioeconomic hardship, and discrimination, the class

1    constitutes a significant percentage of students of the approximately 26,000 students
2    enrolled in CUSD.  Moreover, the inclusion in the class of future members and the
3    dispersal of the class at numerous school sites makes joinder impracticable.

4        59.    The Student Plaintiffs will fairly and adequately protect the interests of
5    the class.  The Student Plaintiffs are represented by experienced counsel who will
6    adequately represent the interests of the class.

7        60.    Defendants have acted and refused to act on grounds generally
8    applicable to the class, thereby making appropriate final injunctive relief and/or
9    corresponding declarative relief with respect to the class as a whole.

10                         **STATUTORY FRAMEWORK**
11   **A.    Section 504 of the Rehabilitation Act**

12       61.    Section 504 of the Rehabilitation Act provides: "No otherwise qualified
13   individual with a disability in the United States ... shall, solely by reason of her or
14   his disability, be excluded from the participation in, be denied the benefits of, or be
15   subjected to discrimination under any program or activity receiving Federal
16   financial assistance ...."  29 U.S.C. § 794(a).  To demonstrate a violation of § 504, a
17   plaintiff must show that (i) he or she is an "individual with a disability" under the
18   terms of the Rehabilitation Act; (ii) he or she is "otherwise qualified" to receive the
19   benefits or services sought, (iii) he or she was denied the benefits of the program
20   "solely by reason of her or his disability"; and (iv) the program receives federal
21   financial assistance. *Id.*

22       62.    "[A]ll of the operations" of "local educational agenc[ies]" are
23   considered "program[s] or activit[ies]" covered by the Act.  29 U.S.C. § 794(b).

24       63.    CUSD receives federal funds and is therefore covered by the
25   Rehabilitation Act.

26       64.    For purposes of the Rehabilitation Act, "individual with a disability" is
27   defined as it is in the Americans with Disabilities Act of 1990 ("ADA").  *See* 29
28   U.S.C. § 794(a); *see also* 42 U.S.C. § 12101 *et seq.*  For an individual to be eligible

- 22 -

for protection under the Rehabilitation Act, he or she must have a "physical or mental impairment that substantially limits one or more major life activities...." 42 U.S.C. § 12102(1)(A).

65.    The Student Plaintiffs and class members have experienced complex trauma, the effects of which "will, at a minimum, substantially limit major life activities," 29 C.F.R. § 1630.2(j)(3)(iii), including "learning, reading, concentrating, thinking, [and] communicating." 42 U.S.C. § 12102(2)(A).

66.    Because the Student Plaintiffs and the class members have experienced complex trauma, they meet the definition of "individuals with disabilities" within the meaning of the Act.   Thus, they are entitled to "meaningful access" to the benefits, services, and programs provided by CUSD. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

67.    As explained below, to provide "meaningful access" to education, CUSD must have a system for addressing the needs of students who are impacted by complex trauma, 34 C.F.R. §§ 104.32, 104.36, and provide a "[f]ree appropriate public education," *id.* § 104.33, by integrating trauma-sensitive approaches and training that have been shown to mitigate the effects of trauma and allow students to meaningfully access public education.

68.    "The remedies, procedures, and rights [of the Rehabilitation Act] . . . shall be available to any person aggrieved by any act or failure to act ... under section 794 [Section 504 of the Rehabilitation Act] of this title."   29 U.S.C. § 794a(a)(2).   Plaintiffs Curry, Castro, and McCoy are persons aggrieved by Defendants' failure to act in accordance with Section 504.

**B.    Americans with Disabilities Act of 1990**

69.    Title II of the ADA states, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity." 42 U.S.C. § 12132.

70.     To prove that a public entity has violated Title II of the ADA, "a plaintiff must show: (1) he [or she] is a qualified individual with a disability, (2) he [or she] was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his [or her] disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (citation and internal quotation marks omitted).

71.     The definition of "disability" under the ADA is identical to that under § 504, and Defendants have the same obligation to the plaintiff class to provide meaningful access to its services as under the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12102.

72.     "The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights [the ADA] provides to any person alleging discrimination on the basis of disability in violation of ... this title." 42 U.S.C. § 12133.

## FACTUAL ALLEGATIONS

### Student Plaintiffs and Class Members Experience Complex Trauma

73.     The Student Plaintiffs and class members attending CUSD schools have experienced and continue to experience traumatic events that profoundly affect their psychological, emotional, and physical well-being.  Although even a single traumatic experience can impair a child's ability to learn, Student Plaintiffs and class members are subjected to multiple, repeated, and sustained traumatic experiences.  Traumatic experiences suffered by Student Plaintiffs and their peers include—but are not limited to—witnessing or experiencing violence; grief over the loss of family members and friends; the loss of a caregiver due to deportation, incarceration, or family separation; the causes and consequences of involvement in the foster system; extreme socioeconomic hardship and its attendant consequences, including homelessness; and discrimination and racism.

74.     Although trauma is widespread and affects children in all communities,[16] complex trauma is particularly ubiquitous among Compton schoolchildren like Student Plaintiffs.     Compton is among the most socioeconomically distressed cities in Southern California, and it experiences attendant high rates of violent crime.  Violence, poverty, and discrimination are so pervasive that in any Compton classroom, the only reasonable expectation is that a significant number of students are likely suffering from complex trauma.  Indeed, the appropriate question in a Compton classroom is not "Have you ever experienced a traumatic event?," but rather, "What traumatic events have you experienced?"

**A.     Students in CUSD Are Routinely Exposed to Traumatic Violence.**

75.     Like many of their peers, Student Plaintiffs have experienced and witnessed violence in their neighborhoods, including on the way to and from school, and even on school grounds itself.

76.     Incidents of shootings, beatings, robberies, and other violent acts take place in the neighborhoods where the Student Plaintiffs and their peers reside and attend school.  Representative examples of the traumatic incidents of violence that Plaintiffs have experienced or witnessed include:

- Plaintiff Peter P. was repeatedly physically and sexually abused by his mother's boyfriends and witnessed physical abuse of his siblings and mother.
- Plaintiff Peter P. reports that he watched as his best friend was shot and killed.
- Plaintiff Peter P. was stabbed with a knife while trying to protect a friend.
- Plaintiff Peter P. reports that he has witnessed over twenty people being shot.
- Plaintiff Kimberly Cervantes was sexually assaulted on the bus on her way home

---

[16] A landmark study of 17,000 individuals found that about two-thirds of children in the United States have been exposed to traumatic events and nearly 40% suffered two or more traumatic experiences.  *Prevalence of Individual Adverse Childhood Experiences*, Centers for Disease Control and Prevention, http:// www.cdc.gov/ace/prevalence.htm (last visited May 16, 2015).

1   from school.

2   • Plaintiff Phillip W. has had guns fired at him repeatedly, including several cases
3     in which he was severely injured or narrowly escaped death.

4   • Plaintiff Phillip W. estimates that he has witnessed more than twenty people
5     being shot, one of whom was a close friend who died when shot in the head.

6   • Plaintiff Virgil W. witnessed his father pointing a gun at his mother.

7   • A stranger attempted to stab Plaintiff Donte J. and his friends when they were
8     standing in front of the Whaley Middle School campus.

9   • Plaintiff Donte J. was arrested by police at gunpoint on school campus when he
10    was mistaken for someone else.

11  • Plaintiff Donte J. was attacked by four people on his way to school.

12          77.   In addition to the traumatic violence experienced by the Student

13  Plaintiffs, other students in CUSD are routinely exposed to trauma-inducing

14  violence or threats.  On March 7, 2015, a student at Dominguez High School was

15  shot twice in the hip while walking in his neighborhood.  Another student was

16  attacked on his way to Centennial High School in December 2014 and experienced

17  such profound trauma as a result that he has not returned to school since January.

18  Female students are frequently sexually harassed and threatened while walking to

19  and from school.  A man in a white van recently attempted to abduct a female

20  student walking to Dominguez High School.

21          78.   Sixteen-year-old Dominguez student Lontrell Turner was murdered in

22  his neighborhood while walking home from church in December 2014.  A freshman

23  student at Dominguez was killed directly adjacent to school grounds in a hit-and-run

24  accident several years ago.  Teachers in Compton schools attend countless funerals

25  of former students.  Plaintiff Curry, who has taught at Dominguez High School in

26  CUSD, typically attends between one and three funerals of current or former

27  students per year.  A teacher at Chavez Continuation School has been informally

28

1  designated as the individual who will attend funerals of former students and current

2  on behalf of Compton teaching staff.

3      79.    The Student Plaintiffs and many of their peers experience similar

4  incidents and threats of violence in the course of traveling to and from school each

5  day.

6      80.    CUSD schools are located in areas wherein significant gang activity is

7  commonplace.  The lack of available options and support available to many young

8  people in the community contributes to gang recruitment, threats, and violence that

9  occur on or near CUSD campuses.  Students report assaults in the mornings just

10  outside the school gates and threats during the school day.  Some students have been

11  compelled to transfer to protect their safety.

12     81.    When violent incidents occur on or near school campuses, not only are

13  the victims and witnesses to those incidents affected, but also the schools may

14  require the students to implement lockdown procedures—called "code yellow" in

15  CUSD—as a safety measure.  These frightening incidents traumatize students by

16  bringing violence into school—a place where students should have an expectation of

17  safety.  While on lockdown, students may be confined to a single classroom for

18  hours, at times dropping to the floor or hiding under furniture in response to the

19  sounds of nearby gunshots, police sirens, or circling helicopters.  Students who have

20  been previously traumatized may be forced to relive those experiences by being

21  locked in a small room with knowledge of the violence taking place outside.

22     82.    For example, last year, Chavez Continuation School was placed on

23  "code yellow" for over two hours in response to a report that individuals had been

24  spotted near the campus fence with a gun.  While students were confined in their

25  classrooms, a police officer rushed into a classroom full of students with his gun

26  drawn.

27     83.    The neighborhoods around CUSD schools are, by all accounts

28  (including governmental reports), extremely dangerous.  In the last twelve months,

1   there have been 25 homicides in Compton, which equates to 26 killings per 100,000
2   people,[17] more than five times the national average.[18]   In the past six months, there
3   have been 470 officially reported violent crimes, defined as homicides, rapes,
4   assaults, and robbery.[19]   This violence exists in close proximity to many CUSD
5   schools.   The following maps show the location of homicides and schools in
6   Compton, with each being spread out across the community, illustrating the
7   proximity of such gun violence to students and schools.

   

*Homicides, last 12 months*[20]            *Schools*[21]

---

[17] *The Homicide Report*, Los Angeles Times, http://homicide.latimes.com/
neighborhood/compton/year/all (last visited May 17, 2015).

[18] *Murder Rates Nationally and by State*, The Death Penalty Information
Center, http://www.deathpenaltyinfo.org/murder-rates-nationally-and-state (last
visited May 11, 2015).

[19] *Mapping L.A. – Southeast: Compton*, Los Angeles Times, http://
maps.latimes.com/neighborhoods/neighborhood/compton/crime/#six-months (last
visited May 17, 2015).

[20] *The Homicide Report*, *supra* note 17.

[21] *Mapping L.A. – Southeast, Compton*, Los Angeles Times, http://
maps.latimes.com/neighborhoods/neighborhood/compton/schools/ (last visited May
17, 2015).

84.   Too many Compton students report feeling unsafe on their school campuses.   The California Healthy Kids Survey data for CUSD reflects that only 47% of elementary school students feel safe at school all the time.[22]

**B.    Death of or Separation from a Loved One**

85.   Nearly every student in the CUSD community has been touched by loss of or separation from caregiver, family member, or close friend.

86.   The loss of a loved one can be difficult for any young person to process, but the nature of the losses suffered by many Compton children may further complicate or exacerbate the trauma.   Development of trauma symptoms after the death of a family member or friend is particularly likely when the death is sudden or violent.   Children exposed to community violence are thus particularly vulnerable to complex trauma related to loss.

87.   Loss is particularly traumatic when the survivor witnessed the events leading to the death or grieves in a setting in which the survivor feels like the threat has not passed.   For example, the trauma of a child whose parent or sibling was killed in a shooting may be re-triggered when hearing gunshots or sirens.

88.   Student Plaintiffs have lost family members or close friends under sudden or violent circumstances, and/or were witness to the traumatic events.   For example, last September, when he was fourteen years old, Plaintiff Phillip W. watched a close friend get shot in the head and killed.   As a middle school student at Whaley, Plaintiff Kimberly Cervantes witnessed the deaths of two students.

89.   Finally, many Compton schoolchildren are grieving not a single death, but the loss of multiple friends and family members within a single year.   While the passing away of even a single loved one is often defining for a child, the chronic nature of the losses suffered by Compton schoolchildren further complicates the

---

[22] *Compton Unified Elementary 2013-2014 Main Report*, California Healthy Kids Survey at 7, *available at* https://chks.wested.org/resources/ComptonUnified_elem1314_main.pdf?1422393875.

- 29 -

1  grieving process.  For example, in the past year, Plaintiff Phillip W. has lost two
2  close friends and a close family member.  Plaintiff Virgil W. has also recently
3  experienced the death of a close friend and a cousin, and nearly lost another close
4  friend and cousin.

5      90.    While some youth may lose parents or caregivers to death, others are
6  separated from parents or guardians due to the incarceration or deportation of the
7  caregiver.  These traumatic and destabilizing events typically result in the sudden
8  absence of a primary caregiver with whom children have significant emotional
9  bonds, or may create a financial crisis in those circumstances where the lost parent
10 was relied upon to support the family income.  Plaintiff Peter P., for example, who
11 is a foster youth and has been separated from his biological parents, has two older
12 brothers who are both currently incarcerated.

13 **C.     Placement of Children in the Foster System**

14     91.    Compton schools serve particularly high numbers of foster youth.
15 CUSD reports at least 254 foster youth district-wide.  By definition, a child who has
16 been placed in the foster care system because of abuse or neglect and/or been
17 removed from his or her family has experienced trauma.   Such trauma is
18 compounded by the fact that the foster youth are routinely subjected to school and
19 placement removals.  When stability is taken away, it further reduces the ability of
20 children to cope with traumatic experiences.

21     92.    For example, children often enter into the foster system because they
22 have lived with a family member who had an alcohol or drug problem, lived with
23 someone who was mentally ill or suicidal, or witnessed or experienced domestic
24 violence.

25     93.    Entry into the foster system itself exacerbates this trauma and creates
26 new trauma.  Foster youth are forcibly removed from the only caregivers they have
27 ever known.  It is common for foster youth to cycle through multiple placements,
28 repeatedly uprooted as they are transferred from foster family to foster family or

group home to group home.  These children lack a continuous caregiver, and often must change schools, hindering the formation of stable relationships with teachers and classmates.  Moreover, they are often re-traumatized due to forced confrontation with past traumatic events in court proceedings and with county social workers as their case winds its way through the county dependency system.

94.    Plaintiff Peter P.'s experience in the foster system is representative of that of many other Compton foster youth.  As a very young child, Plaintiff Peter P. experienced and witnessed physical and sexual abuse in the home and lived with a caregiver affected by substance abuse.  Peter P. was removed from the home of his biological mother when he was five years old.  He was put into the foster system, separated from his siblings, and transferred in and out of a series of foster placements.   On multiple occasions, Peter P. was sent back to live with his biological mother, only to be removed from her home again several weeks later.

**D.    Extreme Poverty, Homelessness and Other Socioeconomic Hardship**

95.    The United States Census Bureau found that 26.3% of Compton residents live below the poverty level, a rate more than 50% higher than the California average.[23]  Similarly, the per capita income in Compton is $13,548, less than half the California average.[24]  93% of children in Compton schools are eligible for Free and Reduced Priced Lunch.

96.    Persistent poverty adversely affects Compton schoolchildren in many ways, including by contributing to homelessness.   There are 1,751 homeless students in Compton schools, or 7.8% of the total student population.   Those children who are not sleeping on the streets may bounce between relatives' couches

---

[23] *State & County QuickFacts, Compton (city), California*, U.S. Census Bureau, http://quickfacts.census.gov/qfd/states/06/0615044.html (last updated Apr. 22, 2015, 9:08 EDT).

[24] *Id.*

1 and friends' floors, rarely knowing how long they will be able to stay or where they
2 will go next.

3        97.     Homeless children are disproportionately likely to have experienced
4 other trauma, such as violence or the loss of a caregiver.  Moreover, children who
5 lack a stable place to stay experience the chronic trauma caused by instability and
6 uncertainty.  Children may go to school each day not knowing where they will sleep
7 that evening.  Plaintiff Peter P., for example, spent two months of homelessness
8 sleeping on the roof of his high school cafeteria.

9 **E.     Discrimination and Racism**

10        98.     For Compton youth, the experience of violence, instability, and poverty
11 is often compounded by unfair treatment due to their race or ethnicity.  The
12 Compton school district is comprised nearly entirely of students of color.  The
13 district serves a student population that is 79% Latino and 19% African-American.[25]
14 Consistent with the experience of youth of color elsewhere in California and
15 throughout the nation, Compton students experience the dignitary harm of racism
16 and discrimination.

17        99.     Racial oppression itself is "a traumatic form of interpersonal violence
18 which can lacerate the spirit, scar the soul, and puncture the psyche."[26]  Research
19 has shown that children who are victims of racism experience psychological

---

[25] *Enrollment by Ethnicity for 2014-15*, California Department of Education, http://data1.cde.ca.gov/dataquest/Enrollment/EthnicEnr.aspx?cChoice=DistEnrEth& cYear=2014-15&cSelect=1973437--Compton%20Unified&TheCounty=&cLevel= District&cTopic=Enrollment&myTimeFrame=S&cType=ALL&cGender=B   (last visited May 16, 2015).

[26] Kenneth V. Hardy, *Healing the Hidden Wounds of Racial Trauma*, 22 Reclaiming Child and Youth 24, 25 (2013).

trauma.[27]  Chronic exposure to acts of racism can lead to internalized devaluation, an assaulted sense of self, internalized voicelessness, and rage.

100.   Incidents of racially-biased policing and law enforcement practices that stigmatize and victimize communities of color have risen to national prominence in recent months.  Student Plaintiffs, like many other Compton youth—particularly African-American youth—have been subject to brutality and disproportionate police treatment:

- Last year, Plaintiff Phillip W. was chased and shot at by the police when he and his friends were playing basketball on the court of his old elementary school campus in the evening.  One of the bullets grazed Phillip W.'s side and left a hole and burn marks on his sweater.  Phillip W. says the incident sent a message to him: "We don't care what you're doing, we think you're bad, so we're going to kill you."

- On another occasion, Plaintiff Phillip W. was playing tag in a Compton park with friends.  A police officer pointed a gun at him and yelled, "Freeze!"  He then looked more closely at Phillip W. and said, "Never mind, you're not him, go on."

- In sixth grade, Plaintiff Donte J. was arrested at gunpoint for walking through Roosevelt Elementary School after-hours in order to take a short cut home.  He later learned the police thought he was someone else.

101.   These encounters affect individuals beyond the direct victims and their families by creating and contributing to mistrust between the community and the police.  This causes students to experience fear and tension during interactions with law enforcement, thereby further exacerbating exposure to trauma.

---

[27] Vanessa M. Nyborg & John F. Curry, *The Impact of Perceived Racism: Psychological Symptoms Among African American Boys*, 32 J. Clin. Child Adolesc. Psychol. 258, 258 (2003) ("Personal experiences of racism were related to self-reported internalizing symptoms, lower self-concept, and higher levels of hopelessness.").

102. The actions of school police in Compton frequently mimic law enforcement encounters in the community, and further reinforce and exacerbate the mistrust. At Chavez Continuation School, for example, a special education student was recently pepper-sprayed in the face outside the school cafeteria by school police.

103. African-American students in Compton, particularly African-American male students, are particularly likely to bear the most harmful consequences of Defendants' failure to address and accommodate student trauma. African-American students in Compton schools are disproportionately subject to school discipline such as suspension or expulsion and pushed out of mainstream high schools and into continuation schools. In the 2013-2014 school year, African-American students received 45% of total disruption/defiance suspensions within CUSD,[28] where they comprise only 19% of the student population.[29]

104. For other students, the experience of violence, instability, and poverty is compounded by the discrimination and marginalization they experience as a result of their sexual orientation or gender identity. This often manifests in bullying, a form of chronic trauma.[30] "Indeed, the student who fails to conform to generally accepted gender stereotypes frequently finds him or herself among the chronically victimized."[31] Such victimization has a profound impact on self-identity and frequently leads to "degradation of [the youth's] ability to envision a healthy,

---

[28] *Enrollment by Ethnicity for 2014-15, supra* note 25.

[29] *Suspension and Expulsion Report For 2013-14*, California Department of Education, http://dq.cde.ca.gov/dataquest/SuspExp/defbyscheth.aspx?cYear=2013-14&cType=ALL&cCDS=19734370000000&cName=Compton+Unified&cLevel=District&cChoice=dDefByEth&ReportCode=dDefByEth (last visited May 16, 2015).

[30] Michael J. Higdon, *To Lynch a Child: Bullying and Gender Nonconformity in Our Nation's Schools*, 86 Ind. L.J. 827, 856 (2011).

[31] *Id.* at 832.

1    meaningful future."[32]   Tragically, "incidences of suicide among children who have

2    been bullied on the basis of nonconforming gender expression are plentiful."[33]

3        105.   Plaintiff Kimberly Cervantes's experience demonstrates how harmful

4    such discrimination can be.  In her junior year at Dominguez High School, Kimberly

5    told a classmate that she identified as bisexual.  The teacher, who was about to begin

6    the lesson, overheard and in front of the entire class proclaimed that Kimberly

7    "shouldn't be gay" and that it was "wrong."  Kimberly felt humiliated and horrified

8    and stopped attending school.

9    **F.      Co-Incidence and Prevalence of Traumatic Events**

10       106.   The traumatic events described above rarely take place in isolation.

11   The experience of Plaintiff Peter P., who has endured nearly all of the types of

12   injury described above, is illustrative.  Peter P. entered the entered the foster system

13   due to violence and substance abuse in the home, and was further re-traumatized by

14   the instability of the foster system, including changing placements and schools.

15   Peter P. has repeatedly witnessed violence and has himself been the victim of

16   violence.   His two older brothers are currently incarcerated, and he has been

17   homeless for the past two months.  Youth like Peter P. who have endured more than

18   one adverse childhood experience are more likely to experience significant adverse

19   outcomes connected to the past trauma.[34]

20                **Trauma Exposure Affects Brain Development**

21       107.   Decades of medical research have made clear that the brains of children

22   who experience chronic or repeated traumas undergo material changes, creating

23   demonstrable physiological impairments that impede the ability to perform daily

24

25   _____

26       [32] *Id.* at 851.

27       [33] *Id.* at 853.

28       [34] *Adopting ACEs, supra* note 5; *No School Alone, supra* note 5; *Impact,*
     *supra* note 3.

1  activities, including thinking, learning, reading, and concentrating. These
2  impairments fall squarely within the meaning of disability under the Rehabilitation
3  Act and Americans with Disabilities Act.

4          108.  The human brain, especially the developing brain, is plastic and
5  adaptable.  It is the brain's plastic quality that allows us to learn, grow, and adapt to
6  new and novel situations.  But it is unfortunately this same feature of the brain that
7  causes trauma to have a profound effect on the developing brains of children.[35]  In
8  plain terms, the brain calibrates itself so it is able to respond to and meet the
9  challenges, tasks, and situations individuals encounter in their daily lives.  However,
10 when an individual is exposed to trauma, especially in the form of repeated
11 traumatic stress, the brain becomes over-sensitized to any potential stimulus that
12 might cue a threat, so the individual perceives ordinary encounters as threating ones,
13 triggering a reactive "fight or flight" or dissociative mode.[36]

14         109.  The ongoing effects of trauma are well-documented.  For example, an
15 individual who has been in an automobile accident at a particular intersection may
16 continue to be nervous when driving through that intersection, long after the
17 accident occurred.  A child who has been bitten by a dog may react with terror to
18 any dog, even one that is clearly non-threatening.  A child who is exposed to
19 repeated complex trauma, therefore, might reasonably perceive ordinary questions
20 from teachers, alarm bells, or hallway jostling as challenges, triggering hostility (a
21 "fight" response) or withdrawal (a "flight" response).  In an educational
22 environment that is not trauma-sensitive, that student is treated as disruptive and
23 may be isolated from other students, suspended, or even expelled.  This only
24 exacerbates the student's trauma.  Even if the student is not punished, nothing is

25
26

27         [35] *Homeostasis, supra* note 7, at 36.
28         [36] *How "States" Become "Traits," supra* note 9, at 277-79.

1 being done to address the psychological and neurological symptoms caused by
2 trauma that are preventing the student from receiving an adequate education.

3 **A.     The Body's Stress Response to Trauma.**

4       110.   According to Dr. Bruce Perry, by definition, "[a]n event is traumatic if
5 overwhelms the [child] dramatically and negatively disrupts homeostasis."[37]  The
6 brain's "normal" state is characterized by "a continuous, dynamic process of
7 modulation, regulation, compensation, and activation" called homeostasis.[38]  Like
8 the body's regulation of its blood sugar levels or the level of oxygen in its muscles,
9 the brain maintains a base equilibrium state, homeostasis.  Homeostasis allows the
10 brain to respond to everyday environmental situations and challenges.

11       111.   When there are rapid, novel, threatening, or unpredictable changes in
12 the environment, the brain engages in an alarm reaction, initiating a state of
13 hyperarousal.  If the perceived threat persists after the initial alarm response, an
14 individual will either further enter into a state of "fight or flight" or begin to move
15 through a dissociative continuum.[39]  The "hyperaroused" fight-or-flight state is a
16 complex, total-body response optimized to allow the person to respond to and
17 survive the novel or threatening situation.  This response disturbs the brain's
18 equilibrium, or homeostasis, by engaging a set of nervous system, neuroendocrine,
19 and immune responses that allow the body to react to the stress or danger in the near
20 to immediate term.[40]

21       112.   As the perceived threat increases, so does the extent of the individual's
22 hyperaroused fight-or-flight state, elevating from a state of calm to vigilance, alarm,

23
24

25       [37] *Homeostasis, supra* note 7, at 36.
26       [38] *Id.* at 35.
27       [39] *How "States" Become "Traits," supra* note 9, at 279.
28       [40] *Id.*

- 37 -

1  fear, and ultimately terror.[41]  During each of the stages of the body's stress response,
2  all aspects of the individual's physical and mental functioning—thinking, feeling,
3  and behaving—change.[42]  The heart and breath start racing, the skin may flush or
4  pale, the pupils dilate, and the muscles tense up.  The individual gets tunnel vision
5  and focuses on non-verbal cues, such as eye contact, body posture, and facial cues
6  rather than words.[43]  The body is totally optimized to respond to the *here and now*,
7  and everything else is put on hold.  Put simply, "[s]omeone being assaulted doesn't
8  spend a lot of time thinking about the future or making an abstract plan for
9  survival."[44]

10      113.  When the threatening situation has passed, the brain mediates the return
11  to its equilibrium, homeostasis state—the heart rate decreases, and the mind returns
12  to its pre-stress-response state.[45]  It is normal and healthy for a young, developing
13  brain to be exposed to predictable and moderate amounts of predictable stress; the
14  world is a dynamic and changing place and the brain must learn to adapt and
15  thrive.[46]    However, if a discrete stress is particularly severe, prolonged, or
16  unpredictable, or if the stress response is evoked chronically over and over, the

17
18
19  _____

20  [41] Bruce D. Perry, *Effects of Traumatic Events on Children: An Introduction*,
    The Child Trauma Academy (2003), at 3 (hereinafter "Effects of Trauma"),
21  *available at* http://www.mentalhealthconnection.org/pdfs/perry-handout-effects-of-
22  trauma.pdf.

      [42] *Id.*
23
      [43] *Id.*
24
      [44] *Id.*; *see also* Bruce D. Perry, *Maltreatment and the Developing Child: How*
25  *Early Childhood Experience Shapes Child and Culture*, The Margaret McCain
26  Lecture  Series  (2005)  (hereinafter  "Maltreatment"),  *available  at*  http://
    www.lfcc.on.ca/mccain/perry.pdf.

27      [45] *Homeostasis*, *supra* note 7, at 35.
28      [46] *Id.* at 37, *Stress*, *supra* note 10, at 2; *Maltreatment*, *supra* note 44, at 2.

brain's regulatory mechanisms can become fatigued or overactivated—thus making it harder for the brain to return to its original equilibrium state.[47]

114.   In contrast, the dissociative, or "freeze and surrender" response is more common in young children, as well as during traumatic events that involve pain or being trapped.[48]   Unlike the fight or flight response, the dissociative response manifests in cognitive and physical immobilization, decreased heart rates, and disengagement from external stimuli.[49]

115.   The spectrum of dissociation ranges from daydreaming to loss of consciousness.   When an educator is unaware of the symptoms of a dissociative reaction, it is easy for him or her to misinterpret a student's dissociative behavior. For example, if a student's sensitized nervous system overreacts to a seemingly innocuous stimulus, such as hearing their name unexpectedly called by a teacher, they may freeze, both cognitively and physically.   The teacher may then give that child a directive, which the child is unable to acknowledge due to the impact of the situation on his or her physiology.   In turn, the teacher understandably perceives the student to be disobedient and is likely to repeat the directive, this time with an explicit or implicit threatened consequence if the student continues to "misbehave." This "'threat' makes the child feel more anxious, threatened, and out of control.... If sufficiently terrorized, the 'freezing' may escalate into complete dissociation."[50] A trauma that would evoke a fight-or-flight response in one individual may evoke a dissociative state in another, and rather than being hyperaroused, the child will appear detached, numb, avoidant, and out of touch with his or her surroundings.[51]

---

[47] *Homeostasis, supra* note 7, at 35-36; *Stress, supra* note 10, at 2.

[48] *How "States" Become "Traits," supra* note 9, at 279, 291; *see also Homeostasis, supra* note 7, at 44; *Maltreatment, supra* note 44.

[49] *How "States" Become "Traits," supra* note 9, at 279-80.

[50] *Id.* at 280.

[51] *Effects of Trauma, supra* note 41, at 4.

**B.      Trauma "Rewires" the Brain.**

116.   Over time, the areas of a child's brain that become most developed are the areas that the child uses most frequently.  As described by Dr. Perry, "[i]n a very real sense, trauma throws the [brain] off balance and creates a persisting set of compensatory responses that, in turn, create a new but less flexible state of equilibrium."[52]  One analogy is to compare the stress-state to a groove in a record— the more the record is played, the deeper the groove becomes engraved into the vinyl.  Or, as Dr. Perry explains, "[t]he more frequently a certain pattern of neural activation occurs, the more indelible the internal representation."[53]  With severe or chronic trauma, "states become traits,"—the "fight or flight" state, or the detached, dissociative state, becomes the brain's new equilibrium.   If a child repeatedly experiences fear, the areas of the brain that control behavior directed by fear can become over-sensitized, and "full-blown response patterns" such as hyperarousal or disassociation can be triggered by seemingly innocuous stimuli.[54]

117.   "Memories of fear are created at multiple levels in the brain's hierarchical systems,"[55] and traumatic events can "create different types of memory."[56]  Because trauma triggers an all-brain response, the emotional, motor, cognitive, and physiologic parts of the brain are all engaged.  Thus, any stimulus that triggers any of these parts of the brain can trigger a full-blown trauma-reaction.[57]  Frequently the individual experiencing the trigger and response will have no control over it.  "Specific cues from the traumatic event may generalize (*e.g.*,

---

[52] *Homeostasis, supra* note 7, at 36.

[53] *How "States" Become "Traits," supra* note 9, at 275.

[54] *Id.*

[55] *Homeostasis, supra* note 7, at 38.

[56] *Id.* at 36.

[57] *Id.*

1  gunshots to loud noises, a specific perpetrator to any strange male).  In other words,
2  despite being away from threat and the original trauma, these key parts of the child's
3  brain are activated again and again.  The memories of fear are seared into the child's
4  neurobiology."[58]

5       118.  These wounds inflicted by trauma are invisible on the skin, but are
6  unmistakably revealed by brain imaging of trauma victims.  Recent research by Dr.
7  Victor Carrion and Shane S. Wong at Stanford University involving brain imaging
8  of traumatized children bears this out.[59]



17       119.  The hippocampus is a brain structure in the limbic system and plays an
18  essential role in new learning and memory formation.  The hippocampus is active
19  when the brain is storing and retrieving information.  However, researchers have
20  shown that part of the hippocampus is less active in a traumatized brain, and that
21  trauma can increase cortisol levels in the hippocampus and ultimately cause it to

[58] *Id.* at 42.

[59] *See* Victor G. Carrion & Shane S. Wong, *Can Traumatic Stress Alter the Brain?  Understanding the Implications of Early Trauma on Brain Development and Learning*, 51 J. Adolesc. Health S23-S28 (2012) (hereinafter "Can Traumatic Stress Alter the Brain?").

[60] Bruce D. Perry, *Childhood Experience and the Expression of Genetic Potential: What Childhood Neglect Tells Us About Nature and Nurture*, 3 Brain & Mind 79, 93 (2002).

decrease in volume.  Researchers found that "physiological hyperarousal may make memories difficult to regulate.  The memories may be processed abnormally, leading to both overrepresentation, such as intrusive thoughts and nightmares, or suppression, inability to recall memories, or selective amnesia."[61]

120.  Medical researchers also found changes in the prefrontal cortex ("PFC") of traumatized students.  The prefrontal cortex is a lobe in the front of the brain that plays an important role in regulating the complex cognitive, emotional, and behavioral functioning of humans.  Its functions include the ability to react to one stimulus instead of another, and also "making the association between stimuli and its rewards, thus contributing to the formation of response-reinforcement associations and guiding goal-directed actions."[62]



121.  Researchers have documented that traumatized children had smaller or abnormal prefrontal cortex structures.  They concluded that "youth with [traumatic experiences] have deficits in key areas of the PFC responsible for cognitive control attention, memory, response inhibition, and emotional reasoning—cognitive tools that may be necessary for learning and therapeutic processing of trauma."[63]

---

[61] *Can Traumatic Stress Alter the Brain?*, *supra* note 59, at S24.

[62] *Id.*

[63] *Id.* at S26.

122.   The above findings represent only a handful of the documented physiological effects of trauma on the brain.  The science is clear: trauma causes palpable, physiological harm to a young person's developing brain.

**In the Absence of Trauma-Sensitive Practices, CUSD Students Affected by Complex Trauma Cannot Meaningfully Access Education.**

123.   Compton students bear the physiological and psychological wounds of the traumatic experiences they have experienced when they arrive in the classroom.[64]  When these wounds go unaddressed, the physiological consequences of past traumatic experiences impair students' capacity to perform daily activities all children engage in such as learning and participating in the classroom.  "[E]xposure to violence is associated with impaired school functioning, decreased IQ and reading ability, lower grade-point average (GPA), increased school absenteeism, and decreased graduation rates."[65]  As is well known, the acquisition of academic skills in reading, writing, and mathematics requires "attention, organization, comprehension, memory engagement in learning, and trust."[66]  Trauma impairs students' ability to operate in each of these areas.

---

[64] After completing a study of 642 preschool children enrolled in Head Start, Dr. Christopher Blodgett concluded that "Children' [sic] ACEs are strong predictors of developmental concerns in social emotional adjustment and in cognitive skills associated with school readiness."  Christopher Blodgett, *ACEs in Head Start Children and Impact on Development* (2014) (manuscript in preparation), Ex. 3 at 10.  He further notes, "The evidence demonstrates that ACE exposure in children is a significant predictor not only of social emotional adjustment but of the school readiness skills critical to children's academic potential." *Id.* at 11.

[65] *Violence Exposure and PTSD, supra* note 3 at 335.  *See also* Lisa H. Jaycox et al., *Support for Students Exposed to Trauma: A Pilot Study*, 1 School Ment. Health 49 (2009); Sheryl Kataoka et al., *Responding to Students with PTSD in Schools*, 21 Child. Adolesc. Psychiatr. Clin. N Am. 119 (2012) (hereinafter "Responding to Students").

[66] Wolpow, Ray et al., *The Heart of Learning and Teaching: Compassion, Resiliency, and Academic Success* 12 (2009) (hereinafter "The Heart of Learning"),

124.   Complex trauma also often induces behaviors due to loss of ability to emotionally self-regulate—including aggression, disproportionate reactivity, impulsivity, distractibility, or withdrawal and avoidance—that disrupt the learning environment and frequently lead to exclusionary school discipline measures or absence from school.   These barriers have tragically predictive consequences for students: academic research has extensively documented the link between trauma and poor academic outcomes, including failure to reach proficiency and failure to graduate from high school.

125.   In a record review of 701 youth who had attended the Bayview Child Health Center, a private, not for profit, community based primary care clinic in San Francisco, Nadine Burke and her co-authors found that only 3% of participants with an ACE score of 0 had learning/behavior problems, while 51.2% of participants with an ACE score greater than or equal to four exhibited learning/behavior problems.[67]

126.   In addition, CUSD schools, which serve high concentrations of students who have experienced significant trauma and have not put effective accommodations in place, generate a multiplier effect upon students and teachers. When schools fail to appropriately accommodate students who have experienced trauma, classrooms can become unmanageable for even experienced teachers and the learning for all students is impacted.   Students who are reliving trauma in the classroom or who cannot self-regulate as a result of trauma and have not been provided with appropriate accommodations may not be able to sit still or concentrate. They may act out or overreact.   Without appropriate accommodations in place, a classroom teacher without proper support and/or training may be forced to stop instruction multiple times to address the issues, taking away instructional

---

*available   at*   http://www.k12.wa.us/compassionateschools/pubdocs/theheartof learningandteaching.pdf.

[67] *Impact, supra* note 3, at 5.

- 44 -

1  time and interfering with consistent and coherent delivery of curricula, which then
2  impacts the education of all students in the class.

3       127.  Empathetic and compassionate teachers and school staff who attempt to
4  address student needs resulting from trauma often lack the training, resources, and
5  support necessary to do so.  These teachers and staff often experience burnout and
6  secondary traumatic stress, leading to turnover and further instability at the school
7  site.  Relationships between staff and students are often disrupted, and students can
8  be further traumatized by the loss of yet another supportive adult in their lives,
9  especially if they have previously endured a great deal of loss.

10       128.  In sum, unaddressed student trauma in CUSD schools undermines the
11  educational environment and denies CUSD students meaningful access to the public
12  education to which they are entitled.

13  **A.**    **Verbal Processing and Communication**

14       129.  One of the first things affected when a student enters a classroom in the
15  hyperaroused, fight-or-flight state is the student's ability to process verbal
16  communication and use language as a medium of communication.  As Dr. Perry
17  explains:

18       The calm child may sit in the same classroom next to the child in an
19       alarm state, both hearing the same lecture by the teacher.  Even if they
20       have identical IQs, the child that is calm can focus on the words of the
21       teacher and, using the neocortex, engage in abstract cognition.  The
22       child in an alarm state will be less efficient at processing and storing
23       the verbal information the teacher is providing.[68]

24
25
26  _____

27      [68] Bruce D. Perry, *Youth Violence - Neurodevelopmental Impact of Violence
in Childhood*, *in* Principles and Practice of Child and Adolescent Forensic
28  Psychiatry 221 (2002).

130.   One study found that children who had suffered chronic trauma had significantly different outcomes between the verbal and performance portions on IQ testing:

> This is consistent with the clinical observations of teachers that these children are 'bright' but can't learn easily…. At rest, the brain of [a traumatized] child has different areas activated-different parts of the brain 'controlling' his functioning.  The capacity to internalize new verbal cognitive informational depends upon having portions of the frontal and related cortical areas being activated—which, in turn, requires a state of attentive calm.  A state the traumatized child rarely achieves.[69]

131.   Because students who have been exposed to chronic, traumatic stress are "consumed with a need to monitor nonverbal cues for threats, their brains are less able to interpret and respond to verbal cues, even when they are in an environment typically considered nonthreatening, like a classroom."[70]

132.   The student who has a more difficult time processing verbal information will learn far less of it.  Likewise, when a student's facility with using language is hampered, he or she has a harder time communicating with others.  This potentially inhibits the student's ability to effectively express abstract concepts and other complex information.  Further, it typically harms the student's ability to develop interpersonal relationships with teachers and peers, which are crucial to academic success.

---

[69] Bruce D. Perry, *Memories of Fear: How the Brain Stores and Retrieves Physiologic States, Feelings, Behaviors and Thoughts from Traumatic Events*, The Child Trauma Academy, *available at* http://www.juconicomparte.org/recursos/ Memories_of_Fear_Wkh9.pdf (internal citations omitted).

[70] *Understanding the Effects of Maltreatment on Brain Development*, Child Welfare Information Gateway, The Children's Bureau (2015), *available at* http://www.childwelfare.gov/pubs/issue-briefs/brain-development.

**B.    Cognitive Development**

133.   Trauma also affects mental reasoning functions, including the analysis of cause-and-effect relationships.    If the environment in which cognitive development occurs is unstable, unpredictable, and/or disordered, this can be reasonably expected to harm a student's ability to process cause-and-effect relationships.[71]   These relationships are the basic building blocks of the narrative form, scientific inquiry, and elementary logic.  Examples of unstable, unpredictable, or disordered environments include sudden absences of family members due to incarceration or death, homelessness, and school lockdowns.  The unpredictability and instability of these environments leaves a child's understanding of cause-and-effect underdeveloped, because his or her universe lacks the basic orderliness the young person who has not experienced complex trauma takes for granted.[72]

**C.    Concentration**

134.   A child who is exposed to severe or chronic trauma may also become preoccupied with the traumatic events and replay them over and over in his or her mind, making it harder for him or her to focus in the classroom.[73]   This can be further compounded by poor sleep, which is a symptom of trauma.[74]

---

[71] Susan E. Craig, *The Educational Needs of Children Living with Violence*, 74 Phi Delta Kappan 67, 68 ("An extended experience of perceived low impact on the world inhibits the development of such behaviors as goal setting and delayed gratification.  These skills, so important to school success, rely on a person's ability to predict and make inferences.  Similarly, failure to establish an internalized locus of control results in an apparent lack of both motivation and persistence in academic tasks, as well as a resistance to behavior-management techniques that assume an understanding of cause and effect.").

[72] *Id.*

[73] *Responding to Students*, *supra* note 65.

[74] Sheryl Kataoka et al., *Effects on School Outcomes in Low-Income Minority Youth: Preliminary Findings from a Community-Partnered Study of a School Trauma Intervention*, 21 Ethn. Dis. 7 (2011) (hereinafter "Effects on School Outcomes").

135.   The difficulty concentrating caused by exposure to trauma can impair students' ability to process, retain, synthesize, and recall information.[75]   This perceived inability to pay attention is sometimes diagnosed as ADHD, but the root cause is often traumatic experiences suffered by the child.[76]

**D.    Goal-Setting and Long-Term Planning**

136.   Traumatized students also have a more difficult time setting and achieving goals, which are important skills for academic success.  Students who do not feel safe at school and who are often in a state of hypervigilance tend to "act instead of plan,"[77] focusing only on their immediate surroundings and situation. Consequently, their ability to make plans, set goals, work toward those goals, and reflect on progress—the "executive functions" necessary for educational progress— can be compromised.[78]  Dr. Perry explains:

> Children in a state of fear retrieve information from the world differently than children who feel calm.  In a state of calm, we use the higher, more complex parts of our brain to process and act on information.  In a state of fear, we use the lower, more primitive parts of our brain....  The traumatized child lives in an aroused state, ill-prepared to learn from social, emotional, and other life experiences. She is living in the minute and may not fully appreciate the consequences of her actions.[79]

---

[75] Bessel A. Van der Kolk, *Psychological Trauma* 18, 96-98 (American Psychiatric Publishing) (2003).

[76] *Stress, supra* note 10, at 4; *Homeostasis, supra* note 7 at 34, 45.

[77] Bessel A. Van Der Kolk, *Developmental Trauma Disorder*, 35 Psychiatric Annals 401 (2005).

[78] *The Heart of Learning, supra* note 66, at 12.

[79] *Maltreatment, supra* note 44, at 3.